UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:25-CV-295-VMC-AAS

**CLEARWATER KEY ASSOCIATION – SOUTH BEACH II, INC.**

PLAINTIFF,

V.

**LEXINGTON INSURANCE COMPANY,**

DEFENDANT. /

**DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Defendant, LEXINGTON INSURANCE COMPANY ("Lexington"), pursuant to Federal Rule of Civil Procedure 56, hereby files its Motion for Final Summary Judgment and Incorporated Memorandum of Law against Plaintiff, CLEARWATER KEY ASSOCIATION – SOUTH BEACH II, INC. ("Plaintiff") on the grounds that Plaintiff failed to provide Lexington with prompt notice of the alleged loss, which prejudiced its investigation.

## SUMMARY OF THE ARGUMENT

Plaintiff reported a loss to its cast iron plumbing system on May 25, 2023. Plaintiff alleged the pipe broke in the wall on the 5th floor outside Unit 504 on August 5, 2020, and caused damage. By the time Lexington was notified of the claim, three (3) years after the loss, the damaged section of the pipe was repaired, and no pictures or videos of the damaged pipe section have ever been produced.

Over four (4) years after the loss, Plaintiff presented to Lexington, for the first time, a claim in the amount of $3,694,164.97 for access to repair its entire cast iron plumbing system that consists of forty (40) sanitary drainage stacks and eight (8) roof stacks. Lexington has no duty under the policy to pay to access the entire cast iron plumbing system as there is no covered damage to the entire plumbing system.

Moreover, the record evidence shows this was not a one-time event. Rather the record is replete with evidence that many losses were sustained to the cast iron plumbing system both before and after the reported date of loss. Importantly, Plaintiff identified and repaired these plumbing losses prior to notifying Lexington of the subject loss.

Plaintiff is using this late noticed minor leak that was fully repaired as the basis for demanding $3,694,164.97 to repair its entire cast iron plumbing system. Plaintiff acknowledges that the repair of the fifty (50) year old rusted system is not covered under the policy, and so Plaintiff is claiming $3,694,164.97 to tear out the walls to access the worn-out plumbing system that it needs to replace because it failed to maintain the system.

Lexington is prejudiced because it never had the opportunity to investigate the reported minor loss. In fact, Plaintiff did not even provide any photographs or videos of the reported August 5, 2020, loss. However, this loss is being used as the basis for a multi-million dollar claim to access the system it failed to maintain.

Despite its best efforts to overcome the prejudice of receiving the claim three (3) years post-loss, Lexington was unable to observe the damaged property. Plaintiff offers no evidence rebutting the prejudice Lexington suffered by the late notice. Accordingly, Lexington is entitled to the entry of final summary judgment.

Even if Lexington had not been prejudiced by the late notice, there would be no coverage for access to all of the cast iron pipes in order to replace the cast iron piping system due to age and wear and tear of the plumbing system.

## STATEMENT OF MATERIAL FACTS

1. Lexington issued a policy of insurance to Plaintiff bearing policy number 41-LX-062798917-2 ("Policy"), for purposes of providing certain insurance coverage for Plaintiff's property, located at 1430 Gulf Boulevard, Clearwater, Florida 33767 ("Property"), with effective dates from April 27, 2020, to April 27, 2021. *See* D.E. 22-1 at pages 1 – 78; *see also* Index to the Exhibits, attached as Exhibit "1;" *see also* Declaration of Marshall Barrett, attached as Exhibit "2" at ¶4.

2. The Property was built in 1974, consisting of ninety-five (95) condominium units and a cast iron plumbing system that is original to its construction. *See* Deposition of Plaintiff's Corporate Representative and Maintenance Supervisor, Gjergii "George" Pjetri dated August 11, 2025, attached as Exhibit "3"at page 51, lines 10 – 16, and page 59, lines 19 -22.

3. There are forty (40) sanitary drainage stacks and eight (8) roof stacks. *See* Deposition of Plaintiff's Plumbing Expert, Ryan Penna dated August 6, 2025, attached as Exhibit "4" at page 38, lines 3 – 19.

4. The majority of the drain stacks are independent of each other. *See* Deposition of Plaintiff's Corporate Representative and Maintenance Supervisor, Gjergii "George" Pjetri dated September 8, 2025, attached as Exhibit "5"at pages 138 - 139, lines 20 - 8.

5. Plaintiff has had cast iron plumbing issues that have occurred at the Property, which required repairs that had been completed in every year from 2017 to the present. *See* Deposition of Plaintiff's Property Manager, Kathleen Day dated September 18, 2025, attached as Exhibit "6"at pages 44 – 45, lines 21 – 1, page 46, lines 13 – 15, and pages 54 – 55, lines 23 - 2.

6. Since August 2017, Plaintiff has experienced more than one hundred (100) sewage leaks at the Property. *See* Exhibit "3"at page 50, lines 5 – 14, page 64, lines 8 – 14, and page 74, lines 4 - 10.

7. The sewage leaks that have been ongoing since August 2017 and would come out of Plaintiff's cast iron plumbing system most of the time. *See Id.* at page 51, lines 7 – 9 and page 74, lines 4 – 10.

8. From August 2017 until August 2020, Plaintiff was aware of over twenty (20) sewage water leaks. *See Id.* at page 65, lines 3 – 11.

9. After August 2017, there have been multiple areas at the Property where Plaintiff identified and reported leaks and called a licensed plumber to repair or replace areas of its cast iron plumbing system. *See Id.* at pages 59 - 60, lines 23 – 14.

10. Prior to the subject loss, on more than one (1) occasion, Plaintiff had to cut open the wall at the Property to get access to the cast iron plumbing system in order to fix a plumbing leak. *See Id.* at page 84, lines 8 – 19.

11. Prior to the subject loss, Plaintiff had a mitigation company come to the Property to provide mitigation services after a sewage leak. *See Id.* at pages 93 - 94, lines 24 – 2.

12. Plaintiff's mitigation company, Chris' Carpet Service & Water Restoration serviced the Property for sewage losses involving Category 3 water in May 2018, June 2018 and July 2018. *See* Deposition Transcript of the Corporate Representative of Chris' Carpet Service & Water Restoration, Barbara Nagy dated September 4, 2025, attached as Exhibit "7" at page 20 – 21, lines 23 – 7, page 29, lines 5 – 9, page 34, lines 2 – 17, pages 35 - 36, lines 25 – 9, page 38, lines 11 – 18, page 39, lines 3 – 5, page 81, lines 5 – 22, page 84, lines 5 -7.

13. In November 2019, Chris' Carpet Service & Water Restoration serviced the Property for a water loss that occurred on the 5th, 6th and 7th floor hallways. *See Id* at pages 50 – 51, lines 24 – 2, page 51, lines 21 – 24, page 52, lines 8 – 22, and page 53, lines 3 – 17.

14. Plaintiff observed the subject loss in the summer of 2020 in the common area right outside of Unit 504, which is located on the eastern end of the 5th floor hallway, and reported the loss to its Property Manager, Kathleen Day f/k/a Kathleen Swift. *See* Exhibit "5" at pages 162 – 163, lines 18 – 12, page 168, lines 13 – 19, pages 169 – 170, lines 23 – 8, and page 172, lines 6 – 11; *see also* Exhibit "6" at page 11, lines 2 – 24, and page 82, lines 19 – 20.

15. Plaintiff does not know when the loss occurred and admits it could have happened prior to June 3, 2020. *See* Exhibit "5" at pages 158 – 159, lines 19 – 16.

16. Plaintiff does not recall what happened on the reported date of loss or how it became aware of the subject loss. *See* Exhibit "3" at page 92, lines 3 – 17.

17. Plaintiff never saw any plumbing invoices related to the subject loss and does not recall how the subject loss is attributable to a cast iron plumbing failure, nor does it recall whether it was ever determined where the water was coming from on the date of loss. *See* Exhibit "5" at page 174, lines 2 – 21.

18. Plaintiff is unaware of any plumber that serviced the Property due to the subject loss and does not recall anyone who came out to the Property for the loss other than Chris' Carpet Service & Water Restoration and MCM Industries, Inc. *See Id*. at page 273, lines 12 – 23.

19. The repairs in relation to the subject loss were completed at the Property on August 5, 2020. *See Id.* at page 157, lines 13 – 22, and pages 160 – 161, lines 19 – 8.

20. In June 2022, Chris' Carpet Service & Water Restoration performed mitigation services for six or seven (6 or 7) days at the Property pursuant to a large water damage loss due to a drain line that affected several floors and units at the Property. *See* Exhibit "7" at page 69, lines 1 – 11, page 71, lines 20 – 24 and page 73, lines 2 – 5.

21. Plaintiff's plumbing contractor, Clearwater Plumbing, provided plumbing services to Plaintiff's cast iron plumbing system for over ten (10) years where it has replaced sections of cast iron plumbing systems at the Property. *See* Deposition of the Corporate Representative of Clearwater Plumbing, Karen Wikoff, dated September 23, 2025, attached as Exhibit "8"at page 31, lines 4 – 8, and pages 40 – 41, lines 21 -8.

22. In 2015, Clearwater Plumbing replaced a section of four (4) inch cast iron pipe with PVC. *See Id.* at page 19, lines 5 – 24.

23. In June 2018, Clearwater Plumbing replaced cast iron piping at the Property pursuant to the request of Plaintiff. *See Id.* at pages 38 – 39, lines 19 – 3, and page 39, lines 16 – 19.

24. In July 2018, Clearwater Plumbing replaced another area of cast iron pipe at the Property. *See Id.* at page 41, lines 14 – 21.

25. In January 2020, Clearwater Plumbing replaced a three (3) inch roof drain and ten (10) feet of cast iron pipe from the roof to the parking garage. *See Id.* at pages 54 – 55, lines 21 – 22, pages 55 – 56, lines 23 – 2, and page 57, lines 1 – 10.

26. After the subject loss, in May 2021, Clearwater Plumbing replaced a section of cracked cast iron pipe in the soil stack with PVC. *See Id.* at pages 63 – 64, lines 21 – 19.

27. In June 2022, Clearwater Plumbing replaced eight (8) feet of cracked cast iron pipe at the Property. *See Id.* at pages 71 - 72.

28. In July 2022, Clearwater Plumbing replaced eleven (11) feet of cast iron pipe between Units 312 and 412 at the Property. *See Id.* at page 73, lines 9 – 22, and pages 73 – 74, lines 25 – 13.

29. In September 2022, Clearwater Plumbing replaced six-and-a-half (6.5) feet of cast iron plumbing at the Property. *See Id.* at page 74, lines 14 – 22.

30. The June 3, 2020, loss was reported to Lexington on May 25, 2023. *See* Exhibit "2" at ¶5; *see also* D.E. 1-1 at ¶14; *see also* D.E. 22 at ¶14.

31. Plaintiff does not know why it waited until May 25, 2023, to report the loss to Lexington. *See* Deposition of Plaintiff's Corporate Representative and President of the Board of Directors, Gerald Bilbrey dated August 22, 2025, attached as Exhibit "9" at page 104, lines 2 – 8; *see also* Exhibit "5" at pages 274 – 275, lines 24 – 2.

32. On May 30, 2023, Lexington's adjuster, Jeremy Minter conducted an inspection of the Property. *See* Deposition of Jeremy Minter dated October 7, 2025, attached hereto as Exhibit "10" at page 15, lines 5 – 22.

33. During this time, Mr. Minter observed what was repaired due to the loss, which was reported to have been completed in August 2020. *See Id.* at pages 12 – 13, lines 18 – 8, page 16, lines 3 – 24, page 17, lines 2 – 19, and pages 19 - 20.

34. Mr. Minter requested all documentation relating to the alleged damage from Plaintiff's public adjuster; however, he was only provided with invoices. *See Id.* at page 13, lines 2 – 8, page 13, lines 17 – 24, and pages 13 – 14, lines 25 – 9.

35. The only documents Plaintiff has that pertain to the loss are two (2) invoices, one for mitigation and another for dry wall repairs. *See* Exhibit "5" at page 273, lines 3 – 11, and Exhibit Numbers 10 and 14.

36. Lexington has not been provided with any photographs or videos depicting the damage that occurred to the east end of the 5th floor hallway on the reported date of loss. *See* Exhibit "2" at ¶8.

37. In August 2023, Clearwater Plumbing performed a camera study of all cast iron pipe drains at the Property, where no cracks were found and it was determined that all the drains looked fine and were in good working order with no need to service any of the drains inspected. *See* Exhibit "8" at page 80, lines 10 – 25, and page 81, lines 1 - 7.

38. On October 11, 2023, and November 3, 2023, Justin Cox, P.E. of EFI Global conducted an inspection of the Property. *See* Deposition of Justin Cox, P.E. dated September 9, 2025, attached as Exhibit "11" at page 38, lines 23 - 25.

39. On December 4, 2023, Justin Cox, P.E. prepared his Cause & Origin Assessment, which concluded, among other things that, "[t]he presence of prior repairs to the drain stacks and interior finishes and the lack of documentation provided to EFI indicting the history of leaks and plumbing repairs impeded EFI's ability to determine the time, extent, and location of leaks at the drain stacks at the subject structure." *See* Deposition of Justin Cox, P.E. Volume II dated September 9, 2025, attached as Exhibit "12" at page 9, lines 15 – 25, page 10, lines 1 – 24, and Exhibit Number 7.

40. On July 11, 2024, the President of Plaintiff's Board of Directors, Gerald Bilbrey, executed a Proof of Loss attesting that "net amount claimed, unknown at this time". *See* Exhibit "9" at pages 170 – 171, lines 17 – 12, and page 175, lines 4 – 13.

41. On August 28, 2024, Mr. Bilbrey executed a second Proof of Loss, which has a total amount claimed of $3,694,164.97. *See Id.* at pages 193 – 194, lines 9 – 17 and pages 196 – 197, lines 19 – 4.

42. On September 12, 2025, Plaintiff sought to amend its Complaint to assert that "June 3, 2020 is [the] actual date of loss for the occurrence that forms the basis of this lawsuit" as it discovered an invoice from its own mitigation

contractor, Chris' Carpet Services & Water Restoration on September 4, 2025, noting such date. *See* D.E. 20 at ¶6.

43. On September 15, 2025, Plaintiff filed its Amended Complaint now asserting a date of loss of "on or about June 3, 2020", which was two (2) months prior to the August 5, 2020, date of loss provided to Lexington in late May 2023. *See* D.E. 22 at ¶13.

44. As of September 2025, all unit owners at the Property are able to use their drain stacks with no issues. *See* Exhibit "5"at pages 152 - 153, lines 21 – 5; *see also* Exhibit "6" at page 52, lines 6 – 16; *see also* Exhibit "9" at pages 33 – 34, lines 24 - 6.

## MEMORANDUM OF LAW AND ARGUMENT

### I. Summary Judgment Standard

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the

nonmovant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1297-1298 (S.D. Fla. 2006).

## II. Contract Interpretation in Florida

"Under Florida law, insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. United States Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Courts may not, "rewrite contracts, to add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.; see also State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla.

1986); *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979).

Terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical, and sensible interpretation consistent with the intent of the parties—not a strained, forced, or unrealistic construction. *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002). "[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Hagen v. Aetna Cas. & Sur. Co.*, 675 So. 2d 963, 965 (Fla. 5th DCA 1996); *see also Taurus Holdings, Inc.*, 913 So. 2d at 532.

## III. <u>Notice was not Prompt and was Late as a Matter of Law, and Plaintiff Cannot Rebut the Presumed Prejudice to Lexington</u>

A policy notice provision is intended "to enable the insurance company to evaluate its rights and liabilities to afford it an opportunity to make a timely investigation, and to prevent fraud and imposition upon it." *American Fire & Cas. Co. v. Collura*, 163 So. 2d 784, 790 (Fla. 2d DCA 1964); *see also Bankers Ins. Co. v. Macias*, 475 So. 2d 1216, 1217 (Fla. 1985) (notice condition allows insurer to conduct "timely and adequate" investigation). The word "prompt" in a notice provision is akin to notice being required "forthwith" or "as soon as practicable," among others. *Collura*, 163 So. 2d at 792.

Such terms are commonly understood to mean that notice is to be given with reasonable dispatch in light of the facts and circumstances of the case. *Laster v.*

*U.S. Fid. & Guar. Co.*, 293 So. 2d 83, 86 (Fla. 3d DCA 1974) (finding notice of automobile accident untimely where seventeen-day delay). Under Florida law, "the failure of an insured to give a timely notice of loss in contravention of a policy provision is a legal basis for the denial of recovery under the policy." *Ideal Mut. Ins. Co. v. Waldrep*, 400 So. 2d 782, 785 (Fla. 3d DCA 1981). Where an insurer has been deprived of a meaningful opportunity to inspect a loss and investigate facts surrounding a loss, the burden is on the insured to show lack of prejudice. *Id.* In the absence of this showing, an insurer is entitled to final summary judgment. *See, generally, Macias*, 475 So. 2d 1216; *see also PDQ Coolidge Formad, LLC v. Landmark Am. Ins. Co.*, 566 Fed. App'x 845, 849 (11th Cir. 2014) ("Prejudice is properly resolved on summary judgment where an insured fails to present evidence sufficient to rebut the presumption.").

The question of whether an insured's untimely reporting of loss is sufficient to result in the denial of recovery under the policy implicates a two-step analysis." *Yacht Club on the Intracoastal Condo. Assoc., Inc. v. Lexington Ins. Co.*, 599 F. App'x 875, 879 (11th Cir. 2015) (quoting *LoBello v. State Farm Fla. Ins. Co.*, 152 So. 3d 595 (Fla. 2d DCA 2014)). "The first step is to determine whether the insured provided timely notice. Next, if notice was untimely, prejudice to the insurer is presumed, but that presumption may be rebutted." *Yacht Club*, 599 F. App'x at 879 (citing *Macias*, 475 So. 2d at 1218).

Under the *LoBello* standard, Plaintiff cannot show prompt notice. Plaintiff waited until May 25, 2023, to provide Lexington with notice of its claim for damage allegedly occurring on June 3, 2020 - almost 3 years after the loss. *See* Exhibit "2" at ¶5; *see also* D.E. 1-1 at ¶14; *see also* D.E. 22 at ¶14. Plaintiff was admittedly aware of the subject loss in the summer of 2020 and reported it to its Property Manager. *See* Exhibit "5"at pages 162 - 163, lines 18 – 12, pages 169 – 170, lines 23 – 8, and page 172, lines 6 - 11. Plaintiff has no explanation for why it waited until May 25, 2023, to report the loss to Lexington. *See Id.* at pages 274 – 275, lines 24 – 2; *see also* Exhibit "9" at page 104, lines 2 – 8. Because Plaintiff has provided no explanation why it waited three (3) years to provide notice of the loss, the notice was not prompt as a matter of law and Lexington is entitled to a presumption of prejudice under Florida law.[1]

In all cases where an insured fails to give prompt notice to its insurer of a loss, prejudice to the insurer is presumed, and the burden is shifted to the insured to demonstrate lack of prejudice. *See, e.g., Lehrfield v. Liberty Mut. Fire Ins. Co.*, 396 F. Supp. 3d 1178, 1183 (S.D. Fla. 2019). An insured may carry this burden, and

---

[1] Florida courts have found a six (6) months delay in reporting a claim to an insurance carrier as untimely as a matter of law. *See, e.g., PDQ*, 566 F. App'x at 849 (also affirming that there is no ambiguity in the phrase "prompt notice"). A delay of six weeks has been held untimely as a matter of law. *See Waldrep*, 400 So. 2d at 785. Four weeks has been ruled untimely notice as a matter of law. *See Deese v. Hartford Accident & Indem. Co.*, 205 So. 2d 328, 329 (Fla. 1st DCA 1967). A four-month delay has been held to constitute untimely notice to an insurer of a loss. *See Ro-Ro Enter., State Farm Fire & Cas. Co.*, 1994 U.S. Dist. LEXIS 21767 (S.D. Fla. June 22, 1994). Six and one-half months is not "prompt notice." *Morton v. Indem. Ins. Co. of N. Am.*, 137 So. 2d 618, 620 (Fla. 2d DCA 1962), overruled on other grounds, 163 So. 2d 784.

avoid summary judgment against it, by submitting evidence creating a disputed issue of fact as to: "(a) whether better conclusions could have been drawn without the delay[ed] [notice], (b) whether those conclusions could have been drawn more easily, (c) whether repairs to the affected areas that took place in the interim would complicate an evaluation of the extent of the damage or [the insured's] efforts to mitigate its damages, or (d) whether an investigation conducted immediately following the occurrence would not have disclosed anything materially different from that disclosed by the delayed investigation." *Id.* at 1184 (citing *PDQ*, 566 F. App'x at 849-850) (holding that testimony as to causation of damages was insufficient to rebut presumption of prejudice to the insurer where no evidence was submitted creating a dispute of fact as to the enumerated issues, and where the insured provided no evidence indicating that the condition of the property at the time of notice was the same as the condition of the property immediately following the loss).

Florida courts have routinely held that the presumption of prejudice was not rebutted under similar circumstances to those at issue in this case. *See Lehrfield*, 396 F. Supp. at 1184 (holding that the insureds' proffer of an affidavit from their public adjuster, who, in fact, had no personal knowledge of the condition of the insured property at the time of the loss, did not serve to rebut the presumption of prejudice, and, indeed, containing only conclusory allegations, lacked any probative value whatsoever and was inadmissible); *1500 Coral Towers Condo.*

*Ass'n v. Citizens Prop. Ins. Corp.*, 112 So. 3d 541, 545 (Fla. 3d DCA 2013) (affirming summary judgment for the insurer where, "[t]he closest" the insured came to rebutting the presumption of prejudice was a "conclusory statement" by one of its engineers that, in his opinion, "the late notice did not prejudice" the insurer); *Hope v. Citizens Property Ins. Co.*, 114 So. 3d 457, 460 (Fla. 3d DCA 2013) (finding that the insured's submission of a homeowner's affidavit, roofer's repair estimate and public adjuster's report listing various repairs necessary to the structure were conclusory and did not overcome prejudice to Citizens); *Kramer v. State Farm Fla. Ins. Co.*, 95 So. 3d 303 (Fla. 4th DCA 2012) (affirming summary judgment for the insurer where the presumption of prejudice was not rebutted by structural engineer's affidavit stating that roof damage was equally likely to have resulted from wind damage or foot traffic); *Yacht Club*, 599 Fed. App'x at 881 (granting summary judgment in favor of the insurer, noting that the insured undertook certain repairs before filing the claim and the insurer was unable to participate in or investigate prior to those repairs, further noting that the ability to offer testimony regarding causation alone does not satisfy the prompt notice requirement); *Perez v. Citizens Prop. Ins. Corp.*, 343 So. 3d 140 (Fla. 3d DCA 2022) (affirming summary judgment in favor of the insurer where the insured's expert had no access to any information as to the state of the roof immediately following Hurricane Irma, there was no investigation following the initial loss because the insured waited over two years to report the claim and an investigation

by the insured's expert was conducted nearly three years after the incident as well as after repairs were conducted on the roof).

The presumption of prejudice also may not be rebutted by an insured's assertion that the insurer would have denied the claim even had notice been timely. *See Yacht Club*, 599 Fed. App'x at 882 (citing *Gemini II Ltd. v. Mesa Underwriters Specialty Ins. Co.*, 592 Fed. App'x 803, 807 (11th Cir. 2014) (rejecting insured's argument that "an insurer cannot be prejudiced by late notice if it would have denied the claim even if notice had been timely")); *Laster v. U.S. Fid. & Guar. Co.*, 293 So. 2d 83, 86-87 (Fla. 3d DCA 1974) (where "prompt reporting" of accident to insurer "may have enabled insurer to better investigate and assess its rights and liabilities in this case," an insured cannot rebut the presumption of prejudice by pointing to testimony concerning the reason for denial of claim).

Plaintiff is unable to rebut the prejudice it imposed on Lexington through the late reporting of its claim as Plaintiff sustained both prior and subsequent cast iron plumbing failures at the Property, which were repaired and mitigated prior to Lexington being notified of the June 3, 2020, loss in late May 2023. *See* Exhibit "3"at pages 59 - 60, lines 23 – 14, page 84, lines 8 – 19, and pages 93 – 94, lines 24 - 2; *see also* Exhibit "5" at page 157, lines 13 – 22, pages 160 – 161, lines 19 – 8, and pages 166 – 167, lines 13 - 8; *see also* Exhibit "6" at page 131, lines 12 – 16; *see also* Exhibit "7" at page 31, lines 4 – 8, and pages 40 – 41, lines 21 – 8; *see also* Exhibit "8"at page 31, lines 4 – 8, and pages 40 – 41, lines 21 -8.

Moreover, Plaintiff does not know when the loss occurred and admits it could have happened prior to June 3, 2020. *See* Exhibit "5"at pages 158 - 159, lines 19 – 16. Additionally, Plaintiff does not recall what happened on the reported date of loss or how it became aware of the loss. *See* Exhibit "3" at page 92, lines 3 – 17. Furthermore, Plaintiff never saw any plumbing invoices related to the subject loss and does not recall how the subject loss is attributable to a cast iron plumbing failure, nor does it recall whether it was ever determined where the water was coming from on the date of loss. *See* Exhibit "5" at page 174, lines 2 – 21.

Due to Plaintiff's late reporting, Lexington was unable to inspect the Property until years after the loss, and after Plaintiff made repairs as a result of the loss. *See* Exhibit "2" at ¶¶5 – 7; *see also* D.E. 1-1 at ¶14; *see also* D.E. 22 at ¶14; *see also* Exhibit "5"at page 157, lines 13 – 22, and pages 160 – 161, lines 19 – 8. The only invoices produced in relation to the loss were from Chris' Carpet Service & Water Restoration and MCM Industries, Inc. *See* Exhibit "5" at page 273, lines 3 – 23 and Exhibit Numbers 10 and 14. These are invoices for mitigation services and drywall repairs, which were all completed by August 5, 2020. *See Id.* at page 157, lines 13 – 22, and pages 160 – 161, lines 19 – 8. No photos or videos of the damage repaired exists.

In its attempts to alleviate the prejudice imposed on them, Lexington retained adjuster, Mr. Minter, and Professional Engineer, Mr. Cox. Upon inspection, Mr. Minter observed and documented what was repaired, which was

reported to have been completed approximately thirty-three (33) months prior at the Property. *See* Exhibit "10" at pages 12 – 13, lines 18 – 8, page 16, lines 3 – 24, page 17, lines 2 – 19, and page 19, lines 6 - 11. Mr. Minter requested all documentation relating to the alleged damage from Plaintiff's public adjuster; however, he was only provided with invoices. *See Id*. at page 13, lines 2 – 8, page 13, lines 17 – 24, and pages 13 – 14, lines 25 – 9. Thus, Lexington has not been provided with any photographs or videos depicting the damage that occurred to the east end of the 5th floor hallway on the reported date of loss. *See* Exhibit "2" at ¶8. As such, Lexington was unable to see the condition of the Property as it was at the time of the loss. Furthermore, Mr. Cox concluded, among other things that, "[t]he presence of prior repairs to the drain stacks and interior finishes and the lack of documentation provided to EFI indicting the history of leaks and plumbing repairs impeded EFI's ability to determine the time, extent, and location of leaks at the drain stacks at the subject structure." *See* Exhibit "12" at page 9, lines 15 – 25, page 10, lines 1 – 24, and Exhibit Number 7.

The prejudice is compounded by the fact that the fifty (50) year old system had multiple problems due to wear and tear, and Plaintiff had made many repairs and had mitigation services performed. *See* Exhibit "3"at pages 59 - 60, lines 23 – 14, page 84, lines 8 – 19; *see also* Exhibit "5"at page 197 - 198, lines 20 – 3, pages 231 – 232, lines 24 – 13, page 233, lines 3 – 20, page 234, lines 20 – 25, pages 235 – 236, and pages 263 – 264, lines 16 – 6 and lines 21 – 25, and pages 275, lines 3

– 11; *see also* Exhibit "6"at page 131, lines 12 – 16; *see also* Exhibit "7" at page 20 – 21, lines 23 – 7, page 29, lines 5 – 9, page 34, lines 2 – 17, pages 35 - 36, lines 25 – 9, page 38, lines 11 – 18, page 39, lines 3 – 5, page 50 – 51, lines 24 – 2, page 51, lines 21 – 24, page 52, lines 8 – 22, page 53, lines 3 – 17, page 69, lines 1 – 11, page 71, lines 20 – 24, page 73, lines 2 – 5, page 81, lines 5 – 22, page 84, lines 5 -7; *see also* Exhibit "8" at page 19, lines 5 -24, pages 38 - 39, lines 19 -3, and page 39, lines 16 – 19, page 40, lines 14 – 21, pages 54 - 55, lines 21 – 22, pages 55 – 56, lines 23 – 2, page 57, lines 1 – 10, pages 63 – 64, lines 21 – 19, pages 69 – 70, lines 17 – 11, pages 71 – 72, page 73, lines 9 – 22, pages 73 – 74, lines 25 -13 and page 74, lines 14 - 22. Accordingly, Lexington is entitled to summary judgment because it is impossible to determine, three (3) years later, if the reported loss was due to a sudden and accidental pipe break or just another routine wear and tear incident.

## IV. <u>The Policy Does Not Cover the Cost of Access to Repair the Entire Plumbing System.</u>

Plaintiff claims that Lexington must pay for access to repair the entire cast iron plumbing system. There is, however, no evidence there was widespread sudden and accidental damage to the cast iron plumbing system on the reported date of loss. The only evidence presented, which was multiple years after the loss occurred and was repaired, was that one (1) portion of one (1) pipe on the east end of the 5th floor hallway leaked. Moreover, as of September 2025, all unit owners at the Property are able to use their drain stacks with no issues. *See* Exhibit "5"at

pages 152 - 153, lines 21 – 5; *see also* Exhibit "6" at page 52, lines 6 – 16; *see also* Exhibit "9" at pages 33 – 34, lines 24 - 6.

Plaintiff suggests the Policy provides "tear out and access" coverage to replace the entire cast iron plumbing system because of systemic wear and tear. However, in Florida, it is clear the Policy is not a maintenance contract. Notably, no one would insure the Property as Plaintiff suggests because all cast iron pipes eventually fail due to wear and tear. This is evidenced by the copious amount of repairs Plaintiff has made and completed to its cast iron plumbing system from both before and after the reported date of loss. As a result of the aforementioned, Plaintiff's claimed damages are not covered.

The Policy provides the following exclusion for wear and tear:

> CAUSES OF LOSS – SPECIAL FORM
> *** ***
> B. Exclusions
> *** ***
> 2. We will not pay for loss or damage caused by or resulting from any of the following:
> *** ***
> d. (1) Wear and tear;
> (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or quality in property that causes it to damage or destroy itself;
> *** ***
> (4) Settling, cracking, shrinking, or expansion;
> *** ***
> (6) Mechanical breakdown…
> *** ***
> But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or

> damage caused by that "specified cause of loss" or building glass breakage.

*See* D.E. 22-1 at page 29 of 78.

The Policy defines "specified cause of loss" as follows:

> **G. Definitions**
> *** ***
> **2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.
> *** ***
> **c.** Water damage means:
> **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and
> *** ***

*See Id.* at page 36 of 78.

However, the Policy also contains the following limitation:

> CAUSES OF LOSS – SPECIAL FORM
> *** ***
> The following limitations apply to all policy forms and endorsements, unless otherwise stated:
> *** ***
> 4. We will not pay the cost to repair any defect to a system or appliance from which water…escapes.

*See Id.* at pages 32-33 of 78. Pursuant to the plain language of the Policy, there is no coverage for access to a pipe that is damaged due to wear and tear. For the

access provision of the Policy to be triggered, there must be accidental discharge or leakage of water or other substance that escapes as a direct result of the breaking apart or cracking of a plumbing system that causes damage.

In the instant matter, the only damage that was alleged to have occurred on the date of loss due to water or other substance that escaped as a direct result from the breaking apart or cracking of a pipe (Plaintiff itself is not sure which) was on the east end of the 5th floor hallway just outside Unit 504. Significantly, there is no evidence of any other water or other substance that escaped due to the breaking apart or cracking of the plumbing system that resulted in damage on the date of loss. Thus, should any coverage for access exist under the Policy, which Lexington maintains it does not given Plaintiff's failure to comply with its post-loss conditions, it would only be narrowly limited to that one (1) specific section of the one (1) broken or cracked pipe located at the east end hallway of the 5th floor just outside Unit 504. Accordingly, Plaintiff's claim for $3,694,164.97 in "tear out and access" coverage to access its entire plumbing system as a result of the June 2020 loss fails.

## V. <u>Conclusion</u>

Plaintiff breached the notice provisions contained in the Policy by failing to provide notice to Lexington for approximately three (3) years after the alleged date of loss and has produced no evidence that the prejudice to Lexington has been rebutted. Accordingly, final summary judgment should be granted in Lexington's

favor as it was prejudiced as a result of Plaintiff's failure to provide prompt notice, and Plaintiff is unable to rebut that prejudice.

WHEREFORE, Defendant, LEXINGTON INSURANCE COMPANY, respectfully requests this Court enter an Order granting its Motion for Final Summary Judgment and grant any additional relief it deems just and proper.

Respectfully submitted,

**BERK, MERCHANT & SIMS, PLC.**

***/s/ Andrew S. Genden***
Melissa M. Sims, Esq. / FBN:85936
Msims@Berklawfirm.com
Dalvarez@berklawfirm.com
Andrew S. Genden, Esq./FBN 105156
Agenden@berklawfirm.com
eibarra@berklawfirm.com
2 Alhambra Plaza, Suite 700
Coral Gables, Florida 33134
Tel: 786-338-2900/Fax: 786-338-2888
***Counsel for Defendant***

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Shaun M. Cummings, Esq.
**FLORIN ROEBIG, P.A.**
777 Alderman Road
Palm Harbor, FL 34683
Tel: 727-786-5000
Email: FPservice@florinroebig.com
scummings@floringroebig.com
tpaulos@florinroebig.com
***Counsel for Plaintiff***

***/s/ Andrew S. Genden***
Andrew S. Genden, Esq.