UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLEARWATER KEY ASSOCIATION-
SOUTH BEACH II, INC.,

Plaintiff,

vs. CASE NO.: 8:25-CV-VMC-AAS

LEXINGTON INSURANCE
COMPANY,

Defendant.
_____________________________________/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT**

Plaintiff, CLEARWATER KEY ASSOCIATION-SOUTH BEACH II, INC., ("Clearwater Key"), by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56, hereby files its Response to Defendant's Motion for Final Summary Judgment, and states as follows:

## I. Summary of the Response

An insured's duty to provide notice of a claim is triggered not when the occurrence happens, but when the insured has reason to believe that the damage would result in an insurance payout. Here, the earliest that duty was triggered was when Plaintiff's public adjuster, in January 2023, *expected*, without knowing, that the cast iron plumbing system had likely failed. More likely, that duty was triggered when Plaintiff received the plumbing report from its plumbing expert on February 23, 2024.

By that time, and *before* it was required to, Plaintiff had already notified Lexington that the claim would include replacement of the entire cast iron system. Therefore, Plaintiff timely reported the claim and the inquiry stops there.

Even if the claim is found to be not reported timely, Lexington was not prejudiced. Under the circumstances of this case, an investigation conducted immediately following the occurrence would not have disclosed anything materially different from what was disclosed by the allegedly delayed investigation. Additionally, Lexington's experts were able to determine the cause and origin of the loss, and were therefore not prejudiced. Because the investigation would have disclosed the same information regardless of when it was performed, and because Lexington was able to determine the cause of loss, Lexington was not prejudiced.

At most, Lexington has identified a genuine dispute of material fact, which only precludes the entry of summary judgment.

## II. Response to Statement of Material Facts

1. Admitted.

2. Admitted.

3. Admitted.

4. Denied. Each of the stacks are connected and part of one system. (Depo. Gulati, 43:16–29; 61:18–20; 95:5–22; Cox, 52:17–53:16; 70:25–72:2)

5. Denied. Not every plumbing issue during that period was related to deteriorated cast iron pipes. (Day, 45:21–46:15) Further, the issues that were related to deteriorated cast iron occurred *after* the subject date of loss. (Day, 120:18–138:20)

6. Denied. Plaintiff experienced plumbing issues, but many of those issues were unrelated to deteriorated cast iron. (Pjetri, 82:25–24, 50:5–14, and 74:11–25)

7. Denied. See response to #6.

8. Denied. Leaks emanated from both the sewage system and the freshwater supply system. (Pjetri, 65:18–19)

9. Admitted.

10. Admitted. However, there is no evidence of any cracked or broken cast iron due to deterioration prior to the date of loss, so access to the system was, necessarily, for some other purpose such as replacing couplings, bands, or other fittings, identifying leaks coming from Air Conditioning systems, freshwater supply lines, or other sources, or repairing plumbing for reasons other than deteriorated cast iron.

11. Admitted. However, none of those occasions were related to cracked or broken cast iron. Instead, the mitigation services were related to mold from an air conditioner leak (5/8/2018), water from an air conditioner leak (6/27/2018), water from improperly installed toilet flange (7/26/2018), water from a cracked exterior wall (8/17/2019), and water from an unknown cause (11/8/2019). (Day, 152:1–161:13)

12. Denied. Chris' Carpet provided mitigation services for a leaking air conditioner (May and June of 2018) and an improperly installed toilet flange (July

2018). (Day, 152:1–167) Additionally, "category 3 water" on those invoices was associated with mold, not sewage. (Nagy, 21:2–7 and 29:5–19)

13. Admitted. However, the representative from Chris' Carpet testified that "It doesn't say on the paperwork what it was caused from, so I can't answer that." (Nagy, 51:25–52:7)

14. Admitted.

15. Denied. Plaintiff's representatives testified that the water mitigation occurred on June 3, 2020, (Pjetri, 157:13–158:9), and that they were aware of the loss when the water mitigation occurred. (Day, 84:14–20). Further, Plaintiff's engineer confirmed that the cast iron system failed on June 3, 2020. (Gulati, 41:20–42:16; 93:24–94:3; 131:13–132:4; and 168:12–24)

16. Denied. Plaintiff's representatives recalled that the drywall was "significantly wet and starting to fall apart," that Chris' Carpet provided remediation services, and that MCM Industries repaired the drywall. (Pjetri, 166:5–18; Day, 81:2–13) They also saw "wet, mushy drywall [and] carpet that was wet" and recalled that they "opened the walls and saw damages and water…" (Day, 79:12–21) Ms. Day recalled "there was considerably more damage and water than usual," that George Pjetri was the person who replaced the cracked pipe, (Day., 77:15–20, 78:2–14), and that the water was "obviously sewage." (Day, 91:2–6). Ms. Day also recalled a cast iron pipe that was "broken or cracked," and that a new section of cast iron pipe was installed. (Day, 212:14–213:24)

17. Denied. There is no plumbing invoice because Plaintiff's maintenance supervisor replaced the pipe. (Day, 77:15–20, 78:2–14 and 212:14–213:24) (See also response to #16)

18. Admitted. Mr. Pjetri replaced the pipe. (See response to #17)

19. Denied. The MCM invoice dated August 5, 2020 was submitted *after* the repairs were completed. (Cox, 93:11–94:6)

20. Admitted that two years after the subject loss, a backup occurred caused by "sludge." (Day, 132:6–133:2 and 163:20–166:17; Penna, 132:18–22)

21. Admitted.

22. Admitted. A section of pipe was replaced because a vehicle struck a pipe in the garage. (Wikoff, 18:20–25 and 19:18–20:5)

23. Denied. A 90-degree "bend" (not a section of pipe) was replaced and there is no evidence that it was related to any leak. (Wikoff, 39:2–15)

24. Admitted that a section of *roof drain* in the *parking garage* was replaced. (Wikoff, 41:14–43:25)

25. Admitted that another section of *roof drain* in the *parking garage* was replaced.

26. Admitted.

27. Admitted.

28. Admitted.

29. Admitted.

30. Admitted.

31. Denied. Plaintiff's reporting of the claim in May of 2023 was explained by its Corporate Representative, Kathy Day, who testified that Plaintiff did not understand that the loss was covered, and that even if it was covered the amount of damage known to the Plaintiff at that time was not likely to exceed the deductible. (Day, 94:10–96:15 and 99:20–100:11) The Plaintiff believed that the series of leaks were "maintenance items and they would not have met any deductibles or anything, so there was no reason to go through all the song and dance of opening a claim[1]." (Depo. Day, 99:20–100:11). It was not until approximately January 2023 that Plaintiff discovered that their loss may be much larger than originally expected and that the loss may be covered by insurance. (Day, 94:10–96:15)

32. Admitted.

33. Admitted.

34. Admitted that invoices were the only documents available at the time.

35. Denied. The only *repair invoices* are for mitigation and drywall repairs. However, Plaintiff has subsequently produced expert reports, repair estimates, photographs, videos, emails, meeting minutes, financial statements, unrelated invoices, and much more. (*See Plaintiff's responses to Defendant's Requests to Produce*)

36. Denied. No photographs exist of the damaged building material (because repairs were made immediately), but photographs taken after repairs were made were

[1] Notably, Lexington's adjuster testified that when the claim was ultimately reported in May of 2023, the loss was under-deductible and resulted in no payment to its insured, thereby justifying Plaintiff's original belief. (Minter, 26:1–23)

produced. (Minter, 51:17–25) Lexington's adjuster confirmed that by looking at photographs available and by inspecting the property, he was "able to conclude…that the pipe on the fifth-floor hallway which formed the basis of the claim, had cracked or broken apart as a result of wear, tear, and deterioration" and that the section of pipe had been replaced. (Minter, 51:17–25).

37. Denied. Clearwater Plumbing video-inspected approximately the top ten (10) feet of each stack, leaving approximately ninety-five percent (95%) of the system that was NOT inspected[2]. (Affidavit of Ryan Penna; *see also* Wikoff Composite Exhibit 2)

38. Admitted.

39. Denied as phrased. Lexington's own plumber was able to assess whether Plaintiff's cast iron plumbing system needed replacement, which is the basis of Plaintiff's claim. (Shell, 18:5–9; 25:21–24; 60:1–11)

40. Admitted, and with the Proof of Loss was a letter stating: "this Proof of Loss is being provided at your request but does not contain …the amount of loss because that information is not yet known…the proof of loss will be amended to include the amount of loss upon receipt of the estimate."

41. Admitted.

[2] The August 2023 video inspection was done because Plaintiff was replacing its roof and the roofing company needed to ensure that the condition of the stacks would not compromise the newly installed roof. *Id*. Accordingly, only the very top portion of each stack, where they intersect with the roof, was inspected. *Id*. Even a cursory review of the videos—which Lexington claims to have done—makes it obvious that these video inspections fall far short of providing an analysis of "all cast iron pipe drains at the Property."

42. Admitted.

43. Admitted.

44. Denied. Plaintiff's plumbing expert clarified that "all of [the pipes] are obstructed but not obstructed to the point in which they are causing immediate backups," (Penna, 54:1–13), and that although residents could use their plumbing fixtures, it was <u>not</u> "without any problems." (Penna, 54:20–24) Further, Plaintiff's engineer confirmed that leaks are occurring evidencing cracks or breaks in the system. (Gulati, 150:21–151:5)

## III. Additional Material Facts

<u>The Timeline</u>:

1. On or about June 3, 2020, a cracked cast iron pipe caused a water leak at the East end of the fifth-floor hallway causing damage to building materials ("the Subject Occurrence"). (Penna, 107:18–21; Day, 212:2–214:20, 216:10–14)

2. Plaintiff's maintenance supervisor, George Pjetri, replaced a cracked section of cast iron pipe. (Day, 77:17–20 and 212:14–213:24)

3. Lexington's engineer confirmed that there is no evidence that the cast iron system failed prior to June 3, 2020. (Cox vol. II, 65:15–66:5)

4. Plaintiff did not immediately report the Subject Occurrence because they believed, at the time, that the Subject Occurrence was not a covered loss and that the damage to their building was minor and not likely to cost more than their deductible. (Day, 94:10–96:15 and 99:20–100:11)

5. In approximately August 2022, Plaintiff's property manager received a call from public adjuster, Michael Michio, who said he represented other local condominium buildings with cast iron system failures, and he was looking for other buildings with similar issues. (Michio, 39:7–40:23 and 48:21–25; Day, 95:22–96:15)

6. After informing Mr. Michio that Plaintiff's building had ongoing plumbing problems, Ms. Day and Mr. Michio agreed to meet at the property to discuss the situation. (*Id.*; Michio, 44:23–45:17)

7. In approximately October or November of 2022, Mr. Michio met Ms. Day and conducted a brief inspection. (Michio, 48:47:20–48:18)

8. Mr. Michio reviewed Plaintiff's insurance policy and concluded that Plaintiff's ongoing water leaks were covered because they were caused by breaking apart and/or cracking of the Plaintiff's cast iron plumbing system. (Michio, 54:24–55:4)

9. Plaintiff retained Mr. Michio on January 11, 2023, (Michio, 47:24–48:10), after which he conducted a more thorough inspection and reviewed additional documentation and photographs, (Michio, 52:4–22 and 55:16–20).

10. Mr. Michio reported the claim on May 23, 2023, with a reported date of loss of August 5, 2020.[3] (Michio, 57:14–22)

[3] This is the date on the drywall repair invoice. During discovery, the parties obtained an invoice from Plaintiff's mitigation company (Chris' Carpet) showing that the actual date of loss was June 3, 2020.

11. Eventually, the date of loss was amended to June 3, 2020 and Lexington's corporate representative testified that the change in the date of loss "did not hurt or help" in evaluating the claim. (Corp. Rep., 171:20–25)

12. During the investigation, and prior to any coverage determination by Lexington, Mr. Michio informed Lexington that the cast iron plumbing system had deteriorated to the extent that he expected the entire system would require replacement. (Shell, 12:23–14:17)

13. On June 16, 2023, Lexington issued its initial coverage determination concluding that the damaged pipes were excluded from coverage and that the water damage did not exceed the deductible[4]. (Minter, 26:1–23).

14. Lexington's coverage determination did not even consider replacement of the entire cast iron plumbing system, despite Mr. Michio having informed Lexington that it likely needed to be replaced. *Id.*

15. On February 23, 2024, Plaintiff's expert plumber inspected the entire sanitary drainage system and confirmed Mr. Michio's expectation that the entire system required replacement. (Penna, 36:4–13, 46:10–15)

16. Lexington is not aware of any evidence suggesting that Plaintiff *knew* its cast iron plumbing system had failed prior to receiving Mr. Penna's report. (Corp. Rep., 172:1–6)

[4] Lexington's coverage determination serves to justify Plaintiff's initial belief that the circumstances did not warrant making a claim (at least until Plaintiff became aware of additional information as described herein)

17. On August 26, 2024, Triad Restoration finalized its estimated cost to perform the work, (Corp. Rep., 120:13–22), and two days later, on August 28, 2024, Plaintiff submitted its amended proof of loss. (Corp. Rep., 121:24–122:14).

Cast iron deteriorates over time, and Lexington believes Plaintiff's pipes are still in good condition:

18. Lexington recognizes that cast iron pipes continue to deteriorate over time. (Corp. Rep., 96:18–97:1; Cox, 48:12–16, 63:23–25)

19. Lexington's plumber opined that Plaintiff's cast iron plumbing system is in "great" condition. (Shell, 60:1–11)

20. As of November 2024—more than four years after the date of loss, and a year after Lexington's inspection—Lexington believes that the cast-iron plumbing system at Plaintiff's property is in good condition and does not require replacement. (Corp. Rep., 94:10–95:9)

Regarding prejudice:

21. In November of 2023, Lexington's plumbing expert was able to "adequately view the inside of the cast iron pipes at the property to form [his] opinions," (Shell, 18:5–9), and concluded that the pipes were in "great" condition, (Shell, 60:1–11).

22. Lexington agrees that cast iron deteriorates slowly. (Shell, 18:10–16) (Cox, 73:18–74:3)

23. Lexington's plumber could not say how long it takes for the condition of cast iron pipes to be appreciably different due to deterioration. (Shell, 19:20–20:3)

24. Lexington's plumber could not say that the pipes were in a substantially different condition at the time of his inspection than they would have been on the date of loss—three years earlier. (Shell, 20:5–12)

25. Lexington's engineer testified that he did not know how long would need to pass before noticing a substantial change in the condition of cast iron. (Cox, 74:4–8)

26. Lexington's engineer confirmed that his ability to determine the cause of loss would have been the same on August 6, 2020 (the day after repairs were completed) as it was in October 2023 (when he conducted his inspection). (Cox vo. II, 20:3–13)

27. Plaintiff's cause and origin expert testified that he inspected the plumbing system on August 12, 2025 and reviewed the documentation available, and was able to determine the cause and origin of failure based on that information. (Gulati, 68:16–22)

Other Important Facts:

28. Lexington is not claiming that the Plaintiff failed to properly maintain its building. (Corp. Rep., 172:11–14)

## IV. Discussion

The Supreme Court of Florida has established a two-step process for determining whether an insurer can deny coverage based on notice. *LoBello v. State Farm Florida Ins. Co.*, 152 So. 3d 595, 599 (Fla. 2d DCA 2014). First, the court must determine whether "the notice was timely given." *Id.* A determination that notice was

timely concludes the analysis with the first step. *Id*. If the notice was not timely, the court must determine whether the insurer was prejudiced by the delay. *Id.*

**a. <u>Plaintiff timely reported the loss considering all the facts and circumstances of this case</u>**

The notice requirement in an insurance contract is satisfied when notice is given within a reasonable time based on the facts and circumstances of the case. *Castro v. Citizens Prop. Ins.*, 365 So. 3d 1203, 1206 (Fla. 3d DCA 2023); *Bray & Gillespie v. Hartford Fire Ins.*, 2009 U.S. Dist. Lexis 44585, at *18–19 (M.D. Fla. May 27, 2009).

Determining whether notice was timely is for the factfinder unless the evidence is undisputed such that it cannot support a finding whatsoever that the insured provided timely notice. *Id.* (citing *Laquer v. Citizens Prop. Ins. Corp.*, 167 So. 3d 470 (Fla. 3d DCA 2015); *see also Restoration Constr. v. SafePoint Ins.*, 308 So. 3d 649 (Fla. 4th DCA 2020) (refusing to adopt a bright-line rule for when notice is "prompt" and finding that the issue was a question of fact considering "all the facts and circumstances surrounding the loss.") Moreover, an insurer must show that the undisputed facts, ***when viewed in a light most favorable to the plaintiff***, prove that notice was untimely. *LoBello*, 152 So. 3d at 599-600; *Himmel v. Avatar Prop. & Cas. Ins. Co.*, 257 So. 3d 488, 492 (Fla. 4th DCA 2018).

Further, "[i]t is well settled…that 'prompt' [notice]…does not require instantaneous notice." *Laquer,* 167 So. 3d at 474 (quoting *Cont'l Cas. Co. v. Shoffstall*, 198 So. 2d 654, 656 (Fla. 2d DCA 1967). "Florida cases bearing upon the question of notice…[agree] that…a reasonable time depends upon the surrounding

circumstances…." *LoBello*, 152 So. 3d at 599; *Bray*, 2009 U.S. Dist. Lexis 44585 at *18–19; *Yacht Club v. Lexington Ins.*, 599 F. App'x. 875, 879 (11th Cir. 2015).

Prompt notice does not necessarily toll from the date the loss occurred, but rather when a ***reasonable and prudent person would believe that a claim for damages exists***. *Laquer,* 167 So. 3d at 474. Florida's Supreme Court explained that an event must be of "sufficient consequence to trigger an insured's duty to provide notice." *LoBello*, 152 So.3d at 599 (quoting *Waldrep*, 400 So. 2d at 785). "[T]he duty to provide notice arises when a reasonable person…would conclude that an award implicating the policy is likely." *Id*. (quoting *Vision I Homeowners Ass'n v. Aspen Spec. Ins*., 674 F. Supp. 2d 1333, 1338-39 (S.D. Fla. 2009)) Where an insured presents evidence that it did not believe that the damages would implicate the insurer's policy until long after the occurrence, "the court cannot determine that notice was untimely as a matter of law, precluding the granting of summary judgment on the issue of late notice." *Vision I*, 674 F. Supp. 2d at 1338–39 (citing *Bray*, 2009 U.S. Dist. Lexis 44585 at FN. 9) ("Plaintiff did not know the extent of the claimed damage would implicate the…policy until 2005 after certain reports were concluded. As the duty to provide notice arises when a reasonable person…would conclude that an award implicating the policy is likely, [insurer] has not established…when the duty to notify…first arose. Absent a finding as to exactly when the duty to notify arose, the Court cannot determine that notice was untimely as a matter of law.")

Here, the facts indicate that a reasonable person would not have concluded, in June of 2020, that the water damage to the East end of the fifth-floor hallway would

implicate an insurance payment. Plaintiff's property manager (and corporate representative), Kathy Day, testified that "we just took care of [the water leaks] as maintenance items and they would ***not have met any deductibles…So, there was no reason to go through all the song and dance of opening a claim for everything.***" (Day, 100:7–11)

The very earliest that Plaintiff had any indication that its plumbing system *may* require replacement was in early 2023, when its public adjuster, Michael Michio, *expected* that to be the case based on his experience with other claims. Immediately thereafter, Mr. Michio informed Lexington that the claim would likely include replacement of the entire system, and in doing so, satisfied the requirement that prompt notice be given. (Shell, 12:23–14:17)

Further, it was not until Plaintiff received the report from its plumbing expert, on February 23, 2024, that Plaintiff *knew*, rather than merely expected, its entire cast iron drainage system needed to be replaced. (Day, 204:14) By that time, Plaintiff had *already* put its insurer on notice of their expectation that the system would require replacement, via Mr. Michio. Under these circumstances, Defendant has not proven that notice was due in June of 2020. Instead, Plaintiff's duty to notify its insured was triggered on or about February 23, 2024 when Plaintiff had actual knowledge that the entire system needed to be replaced, thereby making it so that "an award implicating the policy was likely." Before that date, it cannot be credibly argued that any reasonable person would have understood that an insurance payout was likely under the circumstances. Lexington's contention otherwise does nothing more than to create

a genuine issue of material fact, thereby precluding the entry of summary judgment on the issue of notice.

Accordingly, summary judgment should be denied based on step one.

**b. <u>Even if Plaintiff's notice was untimely, which it was not, Defendant cannot establish prejudice</u>**

As a general matter, if notice is untimely, a rebuttable presumption arises that the insurer was prejudiced by the late notice. *Stark v. State Farm Florida Insurance Company*, 95 So. 3d 285, 287-88 (Fla. 4th DCA 2012) (quoting *Bankers Ins. Co. v. Macias*, 475 So. 2d 1216, 1218 (Fla. 1985)). That presumption may be rebutted by showing that the insurer has not been prejudiced. *Id*. "Whether the presumption of prejudice to the insurer has been overcome is 'ordinarily … a separate issue of fact.'" *Id*. (quoting *Gonzalez v. U.S. Fid. & Guar. Co.*, 441 So. 2d 681, 681 (Fla. 3d DCA 1983)). Before summary judgment can be granted for late notice, the trial court must determine that the record evidence "conclusively forecloses" the insured's ability to overcome the presumption of prejudice. *Id* (quoting *Robinson v. Auto Owners Ins. Co.*, 718 So.2d 1283, 12185 (Fla. 2d DCA 1998).

Significantly, an insured rebuts the presumption of prejudice if an investigation conducted immediately following the occurrence "would not have disclosed anything materially different from what was disclosed by the delayed investigation." *Yacht Club,* 599 Fed. App'x at 882 (quoting *Niesz v. Albright*, 217 So. 2d 606, 608 (Fla. 4th DCA 1969)). *See also CMR Construction & Roofing LLC v. ASI Preferred Ins. Co.*, No. 2:19-cv-

442-FtM-29MRM, 2021 U.S. Dist. Lexis 43239, at *9 (M.D. Fla, March 9, 2021); *Lehrfield v. Liberty Mut. Fire Ins. Co.*, 396 F. Supp. 3d 1178, 1184 (S.D. Fla. 2019)

In *Stark*, an insured's home suffered roof damage during Hurricane Wilma on October 24, 2005. The insured made repairs and "believed that the cost of repairing the damage would not exceed the deductible." 95 So. 3d at 287. Over time, however, the roof continued to leak, and the insured ultimately concluded that the roof needed to be replaced. *Id.* For the first time, the insured reported their claim to the insurer on March 9, 2009 ***three and a half years after the occurrence***. *Id*. The insurer concluded that it could not determine the cause of roof damage because of the substantial delay in reporting the loss and, therefore, denied the claim. *Id*.

After the insured filed suit, the insurer moved for summary judgment. *Id.* The insured submitted affidavits from their own experts saying that the condition of the roof at the time the insurer inspected, and even afterwards, was such that the insurer would be able to determine that the damage was caused by Hurricane Wilma. *Id*. Nevertheless, the trial court granted summary judgment.

On appeal, the District Court reversed. It held that the record evidence created a genuine issue of material fact as to whether the insurer was prejudiced because of the late notice.[5] Because there was a genuine dispute as to whether the cause of loss could be determined, it was improper for the trial court to grant summary judgment. *Id*.

---

[5] The insured also argued that notice was timely, and therefore the issue of prejudice need not be reached, because it had given notice promptly after discovering that damage would exceed the deductible, thereby making an insurance payout likely. *Id*. at FN. 1 Because the District Court reversed on the issue of prejudice, it declined to decide the merits of whether notice

Similarly, in *Shapiro v. First Protective Ins. Co.*, the District Court reversed summary judgment after a ***three-year delay*** in giving notice. 359 So. 3d 777 (Fla. 4th DCA 2023). The insureds' home was damaged by Hurricane Irma on September 10, 2017. The insureds first noticed the roof leaking in May 2018 and made various repairs. *Id*. at 279. The insureds did not immediately report the claim because it believed "the roof was adequately repaired at a relatively minimal cost." *Id*. From May 2018 to March 2020, the insured made several additional repairs until concluding that the entire roof required replacement. *Id*. On September 8, 2020, only ***two days shy of the three-year contractual deadline***, the homeowners reported the claim. *Id.* The insurer denied the claim, asserting that it was prejudiced by late notice. *Id.*

After the trial court granted summary judgment in favor of the insurance company, the District Court reversed, relying heavily on its prior decision in *Stark*, which was "virtually indistinguishable from the instance case." The Court cited the affidavit of the insured's engineering expert who opined that the cause of loss could still be determined and noted that the insurer was able to observe the same conditions at the time of its inspection that it would have observed had the inspection occurred shortly after the storm. *Id*. Accordingly, a genuine issue of material fact existed as to whether the homeowner could overcome the presumption of prejudice and summary judgment was improper.

---

was promptly given, <u>even after the three-year delay</u>, because it was reversing on other grounds. *Id.*

The instant case is also virtually indistinguishable from both *Stark* and *Shapiro*. Although Plaintiff acknowledged water damage to its property in June 2020, Plaintiff believed the issue to be "routine maintenance" and believed that the loss would not trigger its insurance coverage even if a claim was made. (Day, 94:10–96:15 and 99:20–100:11). As time passed, the Plaintiff experienced additional water leaks and learned that cause of Plaintiff's water leaks was covered by insurance. (Michio, 54:24–55:4). And as soon as Plaintiff ***expected*** that it ***may*** require replacement of the entire cast iron plumbing system, Plaintiff notified Lexington. (Shell, 12:23–14:17) And when Plaintiff's plumbing expert confirmed that the system did, indeed, require replacement, and Plaintiff obtained an estimated cost to do so, Plaintiff confirmed the scope of its claim and provided its plumbing report and estimated to repair to Lexington.

After receiving notice, Lexington inspected the building the same day and again shortly thereafter. Based on those inspections, Lexington asserts that Plaintiff's cast iron plumbing is in "good and working condition" as of their latest inspection in November 2024. (Corp. Rep., 94:10–95:9) Lexington also admitted that cast iron does not get better with time but instead continues to deteriorate. (Corp. Rep., 96:18–97:1) Although Plaintiff disagrees with Lexington's assessment of their pipes, logic demands that if Lexington asserts the pipes are in good condition in November 2024, then those same pipes must also be in good condition (or better) in 2020—four years earlier—when the loss occurred. Therefore, even had Lexington inspected the plumbing system immediately after the loss, they would, necessarily, have concluded that the system was in good and working condition, just as they did in 2024. Said differently, an

investigation conducted immediately following the occurrence would not have disclosed anything materially different from what was disclosed by the investigation in 2023. *See Yacht Club*, 599 Fed. App'x at 882.

Notably, Lexington's plumber testified that he was, in fact, able to form his opinions regarding the condition of the pipes after conducting his inspection in November of 2023. (Shell, 18:5–9) Because he was able to determine the condition of the pipes at the time of his inspection, Lexington was not prejudiced by the so-called delay in providing notice.

Moreover, Lexington's experts testified that they would not expect any appreciable difference in the condition of the pipes based on the alleged delay, and that they could not offer any opinions on how long it might take for a cast iron pipe to experience a substantial change in its condition.(Shell, 19:20–20:12; Cox, 73:18–74:8) Lastly, Plaintiff's engineering expert testified that even if the condition of the pipes had substantially changed between the time of the loss and the time of his inspection, he was still able to determine the cause and origin of the failure of the cast iron system based on the evidence he reviewed, and therefore, his investigation was not impeded in any way due to timing. (Gulati, 68:16–22)

It is also worth noting that the cracked pipe that caused the June 2020 water leak was cut out and replaced immediately. Indeed, it had to be done immediately so that sewage water would not continue to leak into the building, and so that Plaintiff complied with its duty to mitigate the loss. Because of that necessity, whether the Plaintiff reported the loss one month, one year, or three years afterwards, the insurer's

inspection would have revealed the same thing—a section of cast-iron pipe that had been cut out and replaced, and a surrounding cast iron system that had deteriorated such that it was beyond its useful life. And when Mr. Minter inspected the property on May 30, 2023, that is exactly what he saw, a section of pipe in the East end of the fifth-floor hallway that had been removed and replaced with a new section of pipe. (Minter, 17:18–18:8 and 30:21–31:10). And based on his inspection, the invoices submitted to Lexington, and conversations with the insured, Mr. Minter was able to conclude "on behalf of Lexington that the pipe on the fifth-floor hallway which formed the basis of the claim had cracked or broken apart as a result of wear, tear, and deterioration." (Minter, 51:17–25). Said differently, even though the claim was reported nearly three years after the June 2020 occurrence, Lexington—via its own adjuster—was able to determine the cause of loss despite its assertion that it is unable to do so.

For all of these reasons, Lexington was not prejudiced by the timing of the notice. And to the extent there exists a genuine dispute regarding that issue, Lexington is not entitled to summary judgment. Either way, Defendant's motion for summary judgement should be denied.

**c. <u>Lexington's misrepresentations</u>**

Lexington makes several misrepresentations to this Court that require correction.

Lexington argues that it has no duty to pay Plaintiff's claim because there is "no covered damage to the entire plumbing system." (See Motion, p. 2) But Lexington's

insurance policy, by its express terms, provides coverage to "tear out and replace any part of the building or structure to repair damage to the *system*…from which water…escapes" when there is water damage resulting from the "breaking apart or cracking" of the plumbing system. (Corp. Rep., 70:23–72:15) Lexington's representation to the contrary is perplexing given that the language quoted above was extensively discussed during the deposition of Lexington's corporate representative (Corp. Rep., 70:23–72:15)

Lexington also asserts that Plaintiff's plumbing system requires replacement because Plaintiff "failed to maintain the system." (See Motion, p. 2) In contrast, Lexington's Corporate Representative testified that "failure to maintain" is not part of its defenses. (Corp. Rep., 172:11–14)

Lastly, Lexington asserts that Plaintiff's plumbing contractor, Clearwater Plumbing, video-inspected "all cast iron pipe drains" on August 24, 2023, and that those videos prove there are no cracks in the system and the system is "in good working order with no need to service any of the drains inspected." (See Motion, p. 9, #37) And during the deposition of Plaintiff's cause and origin expert, Lexington's counsel confronted the witness with the invoice from the August 24, 2023 video inspection for the purpose of having him "admit" that the plaintiff's own plumber found no problems with the system as of August of 2023. (Gulati, 154:15–156:13)

The problem, however, is that the August 24, 2023 video inspection was done only to ensure that the top section of each stack was suitable for replacement of the Plaintiff's roof. (*See* Affidavit of Ryan Penna) To do that, the August 2023 video

inspection included only *the top ten (10) feet* of each stack and did not include the remaining *ninety-plus (90+) feet* of each vertical stack, nor any of the horizontal sections of the system, nor the main sewage drain leading to the municipal system. Lexington either made representations about the condition of the pipes without having reviewed the video inspections, and therefore misunderstood the evidence, or alternatively, reviewed the video inspections and intentionally misrepresented their content. Either way, Lexington's representations to this Court (and to witnesses) that the system, as a whole, is in good condition based on the August 2023 video inspections is misleading.

## VI. Conclusion

Plaintiff was required to notify Lexington of the claim when it became aware of facts that would make it likely that an insurance payout was forthcoming—and Plaintiff did so in early 2023 when it first learned that the cast iron plumbing system may require replacement due to deterioration. And even if it were determined that Plaintiff's notice was untimely, there was no prejudice to Lexington because its inspections in 2023 revealed substantially the same information that an inspection shortly after the loss would have. At best, Lexington has demonstrated that there is a genuine dispute of material fact regarding whether Plaintiff's notice was timely, and whether Lexington suffered any prejudice. Accordingly, summary judgment is improper and Defendant's Motion should be denied.

**Certificate of Compliance with Typography Requirements**

I HEREBY CERTIFY that the foregoing is written in Calisto MT typeface using 13-point font for the main text and 12-point font for all footnotes, and therefore, complies with Local Rule 1.08.

Respectfully submitted on the 22nd day of December, 2025.

**FLORIN ROEBIG, P.A.**

*/s/ Shaun M. Cummings*
**SHAUN M. CUMMINGS, B.C.S.**
FBN: 0111944
**CHAD K. FLORIN, ESQ.**
FBN: 0121087
**HAL S. WEITZENFELD, ESQ.**
FBN: 645826
777 Alderman Road
Palm Harbor, FL 34683
Telephone: (727) 786-5000
Fax: (727) 772-9833
Service Emails:
FPService@florinroebig.com
SCummings@florinroebig.com
TPaulos@florinroebig.com
**Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE (VIA EMAIL)**

**I HEREBY CERTIFY** that on this 22nd day of December, 2025, the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to Andrew S. Genden, Esq. and Melissa M. Sims, Esq., Berk Merchant & Sims, PLC, 2 Alhambra Plaza, Suite 700, Coral Gables, FL 33134, agenden@berklawfirm.com.com, eibarra@berklawfirm.com, msims@berklawfirm.com and dalvarez@berklawfirm.com.