UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLEARWATER KEY ASSOCIATION –
SOUTH BEACH II, INC.,

      Plaintiff,

v.                           Case No. 8:25-cv-295-VMC-AAS

LEXINGTON INSURANCE COMPANY,

      Defendant.

_____/

**ORDER**

This matter is before the Court on consideration of Defendant Lexington Insurance Company's Motion for Summary Judgment (Doc. # 31), filed on November 14, 2025. Plaintiff Clearwater Key Association - South Beach II, Inc., responded on December 22, 2025. (Doc. # 38). Lexington replied on January 9, 2026. (Doc. # 44). For the reasons that follow, the Motion is denied.

**I.   Background**

**A.   The Parties**

Lexington issued an insurance policy for Clearwater Key's property located at 1430 Gulf Boulevard in Clearwater, Florida (the "Property"), which was in effect from April 27, 2020, until April 27, 2021. (Doc. # 22-1 at 7-8; Doc. # 31-2

1

at ¶ 4). The Property is a nine-story, 95-unit condominium building built in 1974. (Doc. # 31-3 at 51:11-16). The Property still has its original cast-iron plumbing system. (Id. at 59:19-22). The plumbing system has caused many leaks at the Property since at least 2017. (Id. at 50:5-51:9; Doc. # 31-9 at 45:20-47:9).

## B.   The Policy Terms

The policy generally does not cover loss or damage caused by wear and tear. (Doc. # 22-1 at 29 – Causes of Loss – Special Form § (B)(2)(d)(1)). However, if wear and tear results in a "specified cause of loss," the policy covers "loss or damage caused by that 'specified cause of loss.'" (Id. at 29 § (B)(2)(d)). Water damage, which includes "[a]ccidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing . . . system or appliance" is a "specified cause of loss." (Id. at 36 § (G)(2)(c)(1)). "If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, [Lexington] will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes." (Id. at 35 § (F)(2)). The policy requires Clearwater Key to give

2

"prompt notice" of any "loss or damage to Covered Property." (Id. at 46 – Condominium Association Coverage Form § (E)(3)(a)(2)).

## C.   The Subject Loss and Subsequent Plumbing Issues

On or around June 3, 2020, Clearwater Key's maintenance supervisor Gjergii Pjetri observed the subject loss – wet carpet and drywall on the east side of the fifth-floor hallway near Unit 504 – and reported it to the property manager, Kathleen Day. (Doc. # 31-3 at 162:18-163:12, 168:2-22, 169:20-170:16, 172:6-11; Doc. # 31-9 at 11:14-19, 75:18-21, 82:19-23, 84:3-24). Mr. Pjetri repaired the portion of the cast-iron plumbing system that was leaking onto the carpet and drywall by removing the broken or cracked pipe and replacing it with a new section of cast-iron pipe. (Doc. # 31-9 at 212:2-213:6). Clearwater also hired two companies to perform water mitigation services and dry wall repair. (Id. at Exhibits 2 and 3). The repairs were completed by August 5, 2020. (Doc. # 31-3 at 160:19-161:2).

Clearwater Key replaced various other sections of cast-iron pipe at the Property from May 2021 through September 2022. (Doc. # 31-12 at 63:21-64:19, 71:5-72:22, 73:9-22, 73:25-74:22).

3

**D.**    **Reporting and Investigation of the Loss**

Public adjuster Michael Michio contacted Ms. Day in August 2022 as he believed the Property was having plumbing issues. (Doc. # 39-4 at 16:14-17, 39:7-14, 48:21-25). Ms. Day confirmed that the Property was having plumbing issues and agreed to meet with Mr. Michio to discuss whether Clearwater Key had grounds to file an insurance claim. (Id. at 42:20-25, 43:20-44:19). In October or November 2022, Mr. Michio inspected the Property. (Id. at 44:23-45:17, 47:20-48:18). Mr. Michio then reviewed Clearwater Key's insurance policy and found a section which he "believe[d] provided them with coverage." (Id. at 54:24-55:4). Clearwater Key retained Mr. Michio in January 2023. (Id. at 47:24-48:10, 53:12-16).

"On May 25, 2023, Clearwater Key, through its public adjuster, notified Lexington for the first time it was making a claim for a loss dated August 5, 2020, due to a pipe that broke in a wall at the east end of the 5th floor hallway." (Doc. # 31-2 at ¶ 5). Clearwater Key later amended its complaint to assert that the loss actually occurred on June 3, 2020, after it discovered an invoice from its water mitigation contractor that listed June 3, 2020, as the date of loss. (Doc. # 20 at ¶ 6).

4

Initially, Clearwater Key claimed "that they experienced a water loss" in Units 209, 312, 505, 704, and 712 "due to cast iron pipe failure." (Doc. # 31-16 at App'x B at 1). On May 30, 2023, Lexington's claims adjuster, Jeremy Minter, inspected the fifth-floor hallway of the Property with Mr. Michio. (Doc. # 31-14 at 5:19-21, 7:20-8:4, 15:15-20, 16:3-9). No damage was visible as the repairs had already been completed. (Id. at 16:10-18:8). On June 16, 2023, Lexington determined that the portion of the claim which was for the cost of the replaced pipe was not covered by the policy and that the portion of the claim which was for the water damage on the fifth floor was below the deductible. (Id. at 23:21-25, 25:18-27:20). By November 2023, Clearwater Key amended its claim to assert that the entire cast-iron plumbing system had failed. (Doc. # 31-16 at App'x B at 1; Doc. # 39-5 at 12:21-13:9, 14:5-17).

Lexington's engineering expert, Justin Cox, P.E., inspected the Property in October and November 2023. (Doc. # 31-16 at Ex. 7 at 1). Mr. Cox's report states as follows. Mr. Michio told Mr. Cox that "there were 'multiple ensuing loss dates' . . . following an initial leak in Unit 505." (Id. at 2). However, Mr. Michio did not explain "how leaks occurring at various times at the subject structure were related to

events on the reported date of loss." (Id.). Although Clearwater Plumbing had "performed multiple repairs to the drain lines at the subject structure," no documentation "for prior leaks and history of repairs" was provided to Mr. Cox (Id.). A "camera assessment of the drain line" by Lexington's plumbing expert, Tom Shell, revealed cracks in two of the Property's 40 cast-iron pipe stacks. (Id. at 4-5). Photographs reportedly taken by Mr. Michio in September 2023 also showed another crack in the pipe stack serving the "-12 stack at Unit 712." (Id.). Although "many of the reported drain line leaks and resulting damaged finishes had been repaired" prior to Mr. Cox's site visit, Mr. Cox opined "that multiple leaks in the vertical drain stacks had occurred at the subject structure." (Id. at 5). Mr. Cox opined that the "presence of prior repairs to the drain stacks and interior finishes and the lack of documentation provided to [his company, EFI Global,] indicating the history of leaks and plumbing repairs impeded EFI's ability to determine the time, extent, and location of leaks at the drain stacks at the subject structure." (Id.). Nevertheless, Mr. Cox opined that the "leaks on the vertical cast-iron drain stacks occurred on separate dates and were not related to a single event, but occurred independently of one another." (Id.). Mr. Cox

6

concluded that the "occurrence of leaks in the drain lines is expected behavior as the structure continues to age" and that "[m]aintenance of the drain lines is required to prevent future leaks from occurring." (Id.).

Lexington's plumbing expert, Mr. Shell, visited the Property twice in November 2023. (Doc. # 31-16 at App'x B at 1). Mr. Shell ran "a drain line camera through the 40 plumbing vents on the roof of the condominium to inspect the entirety of the cast iron vent and soil pipes." (Id. at 1-2). After watching each drain line video, Mr. Shell "was able to determine that out of 40 cast iron pipe stacks, there are 2 cast iron pipes with cracks in them. The back-to-back bathroom soil stack that serves the -04 units has" two longitudinal cracks," and "the back-to-back bathroom soil stack serving the -03 units" also has a crack." (Id. at 2). Mr. Shell opined that, "[o]therwise, the cast iron pipe in the building is in great condition." (Id.). Mr. Shell further testified as follows. He was able to adequately view inside the pipes at the Property to form his opinions. (Doc. # 39-5 at 18:5-9). Although "the best time" for Mr. Shell to have inspected the pipes was "prerepair," he could not say that the pipes were in a substantially different condition at the time of his inspection than at the time of the loss. (Id. at 20:5-16).

7

According to Clearwater Key's plumbing expert, Ryan Penna, who inspected the plumbing system in February 2024, the loss was caused by "[a] failure in the cast iron pipe caused by wear, tear and deterioration." (Doc. # 31-4 at 32:20-24, 33:18-25). Mr. Penna stated that he was able to determine the cause of the loss based on his video inspection of the pipes and his review of a recording made by Mr. Michio; it was not necessary for him to review historical and maintenance documents or know when the problems with the plumbing system began. (Id. at 33:8-17, 36:4-23, 45:11-46:4). Mr. Penna further opined that the "cast iron sanitary drainage system . . . serving the property has failed" due to "[w]ear, tear and deterioration over time" and "must be replaced in its entirety to prevent further damage." (Id. at 46:12-15, 46:24-47:1).

Clearwater Key's engineering expert, Sonny Gulati, P.E., who inspected the Property in August 2025, also opined that as of June 3, 2020, the plumbing system had failed and needed to be replaced. (Doc.# 39-6 at 44:9-11, 93:11-94:3). Mr. Gulati explained that his forensic investigation was not impeded by the five-year gap between the date of loss and his inspection because he was able to review the photographs and

8

videos taken in 2023 as well as the plumbing and repair invoices from 2020. (Id. at 68:6-70:22).

### E.    Procedural History

In the amended complaint, Clearwater Key alleges that Lexington has breached its contractual obligation to "pay the full amount caused by the loss." (Doc. # 22 at ¶¶ 21, 27). Clearwater Key asserts that the claims investigation revealed that "the cast iron plumbing system throughout the property had failed and needed to be entirely replaced." (Id. at ¶ 17). Clearwater Key claims that the cost covered by the policy "for repair of ensuing losses and tear out and replacement of the building to access the failed plumbing is approximately $3,831,690.70." (Id. at ¶ 23). Lexington filed an answer denying the allegations and asserting affirmative defenses, including that Clearwater Key failed to promptly notify Lexington of the alleged loss. (Doc. # 26).

Lexington moves for summary judgment. (Doc. # 31). Clearwater Key has responded (Doc. # 38), and Lexington has replied. (Doc. # 44). The Motion is ripe for review.

### II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590,

10

593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. Analysis

### A. There Is a Genuine Issue of Fact as to Whether Lexington Was Prejudiced by Clearwater Key's Untimely Notice

Lexington argues that it is entitled to summary judgment because Clearwater Key cannot rebut the presumption that Lexington has been prejudiced by the untimely reporting of the subject loss. (Doc. # 31 at 13-21). In response,

Clearwater Key argues that it timely notified Lexington of the loss. (Doc. # 38 at 13-16). Alternatively, Clearwater Key contends that Lexington was not prejudiced by the delay in reporting the loss as an investigation immediately following the loss would not have disclosed anything materially different from what was disclosed in the delayed investigation. (Id. at 16-21). The Court finds that factual disputes as to whether Lexington was prejudiced by Clearwater Key's untimely notice preclude summary judgment.

"The failure of an insured to give a timely notice of loss in contravention of a policy provision is a legal basis for the denial of recovery under the policy." LoBello v. State Farm Fla. Ins. Co., 152 So. 3d 595, 598 (Fla. 2d DCA 2014) (citation and internal quotation marks omitted). Under Florida law, "the question of whether an insured's untimely reporting of loss is sufficient to result in the denial of recovery under the policy implicates a two-step analysis." Id. at 599; see also Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co., 599 F. App'x 875, 879 (11th Cir. 2015). "The first step in the analysis is to determine whether or not the notice was timely given." LoBello, 152 So. 3d at 599. "If the notice was untimely, then prejudice to the insurer is presumed." Id. "However, the presumption of

12

prejudice to the insurer may be rebutted by a showing that the insurer has not been prejudiced by the lack of notice." Id. (internal quotation marks omitted).

"A determination that the notice was, in fact, timely concludes the analysis with the first step." Id. "However, if the notice was untimely, then the analysis proceeds to the second step." Id. "In the second step, the insured must overcome the presumption by proving that the insurer was not prejudiced by noncompliance with the condition of timely notice." Id. "If the insured is unable to overcome the presumption of prejudice, then the insurer will prevail on a defense of untimely notice." Id.

### 1. Notice

"The purpose of a provision for notice and proofs of loss is to enable the insurer to evaluate its rights and liabilities, to afford it an opportunity to make a timely investigation, and to prevent fraud and imposition upon it." Id. at 598 (internal quotation marks omitted). However, "the duty to notify is not per se triggered when the loss initially occurs, or when the insured first discovers damage to their property." Sec. First Ins. Co. v. Visca, 387 So. 3d 313, 318 (Fla. 4th DCA 2024). "An event must be of sufficient

13

consequence to trigger an insured's duty to provide notice." LoBello, 152 So. 3d at 599; see also Cordero v. Fla. Ins. Guar. Ass'n, Inc., 354 So. 3d 1150, 1153 (Fla. 2d DCA 2023).

"[T]he duty to provide notice arises when a reasonable person, viewing all available facts and information, would conclude that an award implicating the policy is likely." Cordero, 354 So. 3d at 1153 (citation and internal quotation marks omitted). "Stated another way, notice is necessary when there has been an occurrence that should lead a reasonable and prudent [person] to believe that a claim for damages would arise." Visca, 387 So. 3d at 318 (citation and internal quotation marks omitted). "Prompt notice is not excused because an insured might not be aware of the full extent of damage or that damage would exceed the deductible." Yacht Club, 599 F. App'x at 880 ("Whatever concerns the Board had about the extent of damage and its deductible are not relevant under Florida law."); see also 1500 Coral Towers Condo. Ass'n, Inc. v. Citizens Prop. Ins. Corp., 112 So. 3d 541, 543 (Fla. 3d DCA 2013) ("When an insurance contract contains a provision which applies to notice of the damage claim, an insured must give notice of the loss that implicates a potential claim without waiting for the full extent of the damages to become apparent.").

14

Here, the policy does not define what is "prompt" notice of loss or damage. "It is well settled, however, that 'prompt' and other comparable phrases, like 'immediate' and 'as soon as practicable,' do not require instantaneous notice." Laquer v. Citizens Prop. Ins. Corp., 167 So. 3d 470, 474 (Fla. 2d DCA 2015) (quoting Cont'l Cas. Co. v. Shoffstall, 198 So. 2d 654, 656 (Fla. 2d DCA 1967)). "Rather, [n]otice is said to be prompt when it is provided with reasonable dispatch and within a reasonable time in view of all of the facts and circumstances of the particular case." Guzman v. S. Fid. Ins. Co., 332 So. 3d 67, 70–71 (Fla. 2d DCA 2021) (citation and internal quotation marks omitted). "[W]hether an insured has given 'prompt' notice is generally a question of fact for the jury." Id. at 71. But "if the undisputed evidence will not support a finding that the insured gave notice to the insurer as soon as practicable, then a finding that notice was timely given is unsupportable." LoBello, 152 So. 3d at 600.

Clearwater Key argues that "a reasonable person would not have concluded, in June of 2020, that the water damage to the East end of the fifth-floor hallway would implicate an insurance payment." (Doc. # 38 at 14-15). Clearwater Key cites Ms. Day's testimony explaining that Clearwater Key did not report the loss after it was discovered in June 2020 because

15

it "would not have met any deductibles or anything" so "there was no reason to go through the song and dance of opening a claim." (Doc. # 31-9 at 99:7-100:11). Clearwater Key asserts that its duty to notify Lexington was not triggered until on or about February 23, 2024, when it received Mr. Penna's report and learned that its cast-iron plumbing system was damaged beyond repair. (Doc. # 31-9 at 203:11-204:24). Clearwater Key argues that "[b]efore that date, it cannot be credibly argued that any reasonable person would have understood that an insurance payout was likely under the circumstances." (Doc. # 38 at 15).

The Court is not persuaded. Although Clearwater Key may not have been told that its entire plumbing system needed to be replaced prior to February 2024, it is undisputed that Clearwater Key was aware of the subject loss by June 3, 2020. (Doc. # 31-3 at 162:18-163:12, 168:2-22, 169:20-170:16, 172:6-11; Doc. #31-9 at 11:14-19, 75:18-21, 82:19-23, 84:3-24). Ms. Day's concerns about the extent of the loss or the deductible are not relevant in determining whether Clearwater Key gave timely notice to Lexington. Yacht Club, 599 F. App'x at 880; 1500 Coral Towers, 112 So. 3d at 543. Viewing the record in the light most favorable to Clearwater Key, there is "no reasonable interpretation of the evidence which will

16

support a finding that the notice of loss was given as soon as practicable." Ideal Mut. Ins. Co. v. Waldrep, 400 So. 2d 782, 785 (Fla. 3d DCA 1981) ("It should be borne in mind that the insured could not wait until the full extent of the damage to the aircraft was apparent, because the policy covered any 'occurrence' resulting in injury to the aircraft."); see also Yacht Club, 599 F. App'x at 877-78, 880-81 (finding no genuine factual dispute that a condominium association failed to give timely notice of hurricane damage to its insurer until nearly five years later); 1500 Coral Towers, 112 So. 3d at 542-44 (same).

### 2. **Prejudice**

"In delayed notice cases, while prejudice to the insurer is presumed, if the insured can demonstrate that the insurer has not been prejudiced thereby, then the insurer will not be relieved of liability merely by a showing that notice was not given as soon as practicable." Slominski v. Citizens Prop. Ins. Corp., 99 So. 3d 973, 976 (Fla. 4th DCA 2012) (internal citation and quotation marks omitted). "This burden shifting is consistent with the burden shifting which occurs on a motion for summary judgment when the movant has met the initial burden of demonstrating the nonexistence of any genuine issue of material fact." Soronson v. State Farm Fla.

17

Ins. Co., 96 So. 3d 949, 953 (Fla. 4th DCA 2012). "The insured has the burden to show the lack of prejudice if its insurer lost the opportunity to investigate the facts of the claim." De La Rosa v. Fla. Peninsula Ins. Co., 246 So. 3d 438, 441 (Fla. 4th DCA 2018). "Whether the presumption of prejudice to the insurer has been overcome is ordinarily . . . a separate issue of fact." Stark v. State Farm Fla. Ins. Co., 95 So. 3d 285, 288 (Fla. 4th DCA 2012) (internal quotation marks omitted). "Before the trial court should grant summary judgment, the record on such a motion should conclusively foreclose[] the insured's ability to overcome the presumption [of prejudice]." Id. (internal quotation marks omitted).

Here, the testimony of Mr. Penna and Mr. Gulati create genuine issues of material fact as to whether Clearwater Key could overcome the presumption of prejudice caused by the late notice to Lexington. Mr. Penna and Mr. Gulati both opined that they were able to determine the cause of the June 2020 loss even though they did not conduct their own investigations until well after the loss was reported to Lexington. (Doc. # 31-4 at 33:8-17, 36:4-23, 45:11-46:4; Doc. # 39-6 at 44:9-11, 68:6-70:22, 93:11-94:3). Indeed, Lexington's own plumber, Mr. Shell, acknowledged that he was able to adequately view inside the pipes during his investigation and that he could

18

not say whether the pipes were in a substantially different condition in June 2020. (Doc. # 39-5 at 20:5-16). Although Lexington's engineer, Mr. Cox, opined that the "presence of prior repairs to the drain stacks and interior finishes and the lack of documentation . . . indicating the history of leaks and plumbing repairs impeded [his] ability to determine the time, extent, and location of leaks," Mr. Cox nevertheless was able to render an opinion as to the cause of the leaks. (Doc. # 31-16 at Ex. 7 at 5).

Based on this evidence, a reasonable jury could conclude "that an investigation conducted immediately following the occurrence would not have disclosed anything materially different from that disclosed by the delayed investigation." Ad Khan Props., LLC v. Clear Blue Specialty Ins. Co., No. 6:22-cv-1347-RBD-LHP, 2024 WL 3103609, at *5 (M.D. Fla. Apr. 5, 2024) (internal quotation marks omitted) (finding that expert engineer's testimony that he could determine the cause of the damage almost two years after the loss created a triable issue of fact on prejudice); see also Stark, 95 So. 3d at 288 ("Nicholson's opinion that the insurer could still have observed the 'classic pattern of windstorm damage' left by Hurricane Wilma as late as 2010 suggested that the insureds could convince a finder of fact that their noncompliance with

19

the notice provision did not prejudice the insurer by depriving it 'of the opportunity to investigate the facts'").

The record does not "conclusively foreclose" Clearwater Key's ability to overcome the presumption of prejudice. Stark, 95 So. 3d at 288 (internal quotation marks omitted). Accordingly, Lexington is not entitled to summary judgment on this basis.

**B.    Lexington Has Not Demonstrated that Clearwater Key Seeks to Recover Damages Not Covered by the Policy**

Alternatively, Lexington argues that Clearwater Key's multimillion-dollar claim for "'tear out and access' coverage to access its entire plumbing system as a result of the June 2020 loss fails" because "the only damage that was alleged to have occurred on the date of loss due to water or other substance that escaped as a direct result from the breaking apart or cracking of a pipe . . . was on the east end of the 5th floor hallway just outside Unit 504." (Doc. # 31 at 24). In response, Clearwater Key argues that the policy expressly provides coverage for its claimed damages. (Doc. # 38 at 21-22). The Court is not persuaded by Lexington's contention.

"The question of whether a particular risk is covered by an insurance policy is a question of law when the facts are undisputed." State Farm Fire & Cas. Co. v. Castillo, 829 So.

20

2d 242, 244 (Fla. 3d DCA 2002). "As such, to determine as a matter of law whether [a plaintiff's] loss is covered by its insurance policy with [a defendant], the Court must first assess whether genuine disputed issues of fact remain as to the cause of the loss." Marc E. Bosem MD PA v. Sentinel Ins. Co., Ltd., No. 20-62205-CIV, 2022 WL 3154789, at *4 (S.D. Fla. Jan. 3, 2022).

Here, Clearwater Key's experts opine that the entire plumbing system had failed and required replacement as of the June 3, 2020, loss. (Doc. # 31-4 at 32:20-24, 33:18-25, 46:12-15, 46:24-47:1; Doc. # 39-6 at 44:9-11, 93:11-94:3). In contrast, Lexington's engineering expert, Mr. Cox, opined that the leaks after the June 3, 2020, loss were not related and did not indicate a systemic failure. (Doc. # 31-16 at Ex. 7 at 5). Mr. Cox further opined that preventing future leaks required maintenance of the pipes, rather than a complete replacement of the system. (Id.).

"Because the parties have competing experts as to the cause of the subject loss, summary judgment on the issue of coverage is inappropriate." Marc E. Bosem MD PA, 2022 WL 3154789, at *5. Genuine issues of material fact exist regarding whether the damage for which Clearwater Key seeks

21

coverage was caused by a failure of the entire plumbing system or was an isolated leak.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Lexington Insurance Company's Motion for Summary Judgment (Doc. # 31) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 18th day of February, 2026.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

22